IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSE L. MARTINEZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 09 C 3051 |
| | ) |
| MICHAEL J. ASTRUE, | ) Judge Nan R. Nolan |
| **Commissioner of Social Security,** | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jose L. Martinez claims that he is disabled due to depression. He filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff has moved for summary judgment. For the reasons set forth here, the motion is granted in part and denied in part.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on October 25, 2006, alleging that he became disabled on April 1, 2002 due to depression, suicide attempts and "black out spells." (R. 132-37, 157.) The applications were denied initially on January 24, 2007, and again on reconsideration on June 18, 2007. (R. 52-56, 58-61.) Plaintiff requested an administrative hearing, which Administrative Law Judge Edward B. Pappert (the "ALJ") held on April 7, 2008. Several months later, on November 21, 2008, the ALJ found that Plaintiff is not disabled because he is capable of performing his past relevant work as a board up person and/or an insulation installer. (R. 10-18.) The Appeals Council denied Plaintiff's request for review on March 18, 2009, and affirmed the denial on August 27, 2009

after considering additional evidence. (R. 1-3, 4-6.) Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

## **FACTUAL BACKGROUND**

Plaintiff was born on August 14, 1956 and was 52 years old at the time of the ALJ's decision. (R. 135.) He attended school through the ninth grade, but he speaks only limited English and needed a Spanish-language interpreter at his hearing. (R. 21, 26-27, 156.) Plaintiff has worked as a board up person and an insulation installer. (R. 40-41, 43, 203.)

**A.     Medical History**

On August 31, 2004, Plaintiff voluntarily admitted himself to Chicago Read Mental Health Center due to depression with suicidal ideation. (R. 212.) After a successful heroin detoxification, Plaintiff was reassessed as psychiatrically stable and discharged on September 13, 2004. Doctors noted that Plaintiff's depressed mood had resolved, and that there was "no recurrence of suicidal thoughts" at that time. (*Id*.) Plaintiff also "appeared appropriate"; "attended to his personal hygiene and necessities adequately"; was "intact with reality . . . coherent [and] logical"; showed "no looseness of association, flight of ideas or ideas of reference"; and demonstrated good insight and judgment. (R. 213.)

Plaintiff had a Mental Health Assessment on November 7, 2006, and reported feeling sad, anxious, tired and hopeless. He also said that he experienced persecutory hallucinations, nightmares, headaches, suicidal thoughts and exaggerated fears, and he avoided places and situations. Hilda Tamayo, a Qualified Mental Health Professional with the Chicago Department of Public Health, Division of Mental Health ("CDPH"), noted that it was "[d]ifficult to determine" Plaintiff's reliability, but she diagnosed him with severe major depression with psychosis and seasonal affective disorder. (R. 298, 308, 310.) Also on November 7, 2006, Plaintiff's friend Mercedes Pepin completed a Function Report - Adult Third Party on his behalf. (R. 165-72.) Ms.

Pepin lets Plaintiff live in her basement, and indicated that he watches a lot of television, and mainly stays in his room alone and sleeps during the day. (R. 165.) She stated that he is unable to work due to anxiety and lack of concentration, and he has become "more of an introvert with very limited skills." (R. 171.)

Records from CDPH dated November 7 and 14, 2006 indicate that Plaintiff was referred for individual and group therapy. (R. 347-48.) On December 19, 2006, Jessie Mabaquiao, M.D., of CDPH examined Plaintiff and indicated that he was feeling better, though still hearing voices. Dr. Mabaquiao found Plaintiff to be "improved," with good insight and intact judgment; diagnosed major depression and polysubstance problems; and increased his medications. (R. 361.)

On January 9, 2007, Plaintiff saw Robert W. Buchanan, M.D., for a consultative psychiatric evaluation. (R. 263-67.) Dr. Buchanan described Plaintiff as "fidgety" and "not a particularly good historian." (R. 263.) He also observed that Plaintiff was "shaky," "somewhat agitated," "easily distracted" and "depressed." (R. 265.) Plaintiff told Dr. Buchanan that he is not allowed to use the kitchen because he left the stove on a couple times, and that he has no friends and usually stays alone. Plaintiff's thought processes revealed auditory hallucinations, moderate paranoia and suicidal ideation, but no looseness of association or homicidal thoughts. (*Id*.) Dr. Buchanan diagnosed "Recurrent Major Depression with psychotic features," "History of Polysubstance Abuse" and "History of Marital Problems." (R. 266.) He recommended that Plaintiff's psychiatric treatment be "bolstered with changes in his medication and perhaps some more psychotherapy to help him get back on his feet." (*Id*.) At the time, Plaintiff reported taking Risperdal (an antipsychotic) and Lexapro (an antidepressant). (R. 264.)

One week later on January 16, 2007, Plaintiff attended therapy with Therapist Tamayo at CDPH. He reported continued feelings of paranoia and stated that he prefers to stay in bed watching television. Therapist Tamayo confirmed that Plaintiff presented with depressive and psychotic symptoms, and recommended an increase in his medication. (R. 346.) The same day,

3

Plaintiff told Dr. Mabaquiao that he was still hearing voices of his dead relatives and feeling paranoid, and he described sometimes having a "blank mind." Dr. Mabaquiao diagnosed Plaintiff with Bipolar Disorder, increased his dosage of Risperdal, and added a prescription for Depakote.[1] (R. 362.)

On January 18, 2007, Ronald Havens, Ph.D., performed a Psychiatric Review Technique of Plaintiff. (R. 268-81.) Dr. Havens found Plaintiff moderately limited in his ability to maintain social functioning, concentration, persistence or pace, and mildly limited in his activities of daily living. (R. 278.) In reaching this conclusion, Dr. Havens reviewed the statement from Ms. Pepin; records from Chicago Read Mental Health Center; and Dr. Buchanan's January 9, 2007 report. (R. 280.) Also on January 18, 2007, Dr. Havens conducted a Mental Residual Functional Capacity Assessment of Plaintiff. (R. 282-85.) He found Plaintiff moderately limited in his ability to understand, remember and carry out detailed instructions, and in his ability to set realistic goals or make plans independently of others. (R. 282-83.) Dr. Havens opined that "[a]ll things considered it is likely that claimant['s] presentation at [the consultative examination with Dr. Buchanan] is not entirely credible for severity but whether or not this is the case he can understand and remember well enough to engage in simple assignments." In Dr. Haven's view, Plaintiff can "concentrate and persist adequately on repetitive, routine tasks," and has both adequate social skills and the emotional temperament required to interact appropriately with others and adjust to minor routine changes in the work environment. (R. 284.)

Dr. Mabaquiao's progress notes indicate that on March 1, 2007, Plaintiff was feeling better with good insight, intact judgment and no active ideations or plans regarding suicide. Plaintiff continued to experience delusions, but his overall condition was "improved." Dr. Mabaquiao confirmed a diagnosis of major depression and increased Plaintiff's medications. (R. 359.) By

---

[1] Depakote is "used to treat the manic phase of bipolar disorders (manic-depressive illness)." (http://www.drugs.com/depakote.html.)

4

March 29, 2007, Plaintiff was feeling better and less paranoid. Dr. Mabaquiao described him as stable and improved, with good insight, intact judgment and no hallucinations or delusions. (R. 360.)

On April 28, 2007, Lionel Hudspeth, Psy.D, reviewed Plaintiff's file and affirmed Dr. Havens's January 18, 2007 mental assessment. (R. 291-92.) Dr. Hudspeth noted that Plaintiff reported no change in his conditions or any new impairments, and found that he "retains the capacity to perform unskilled work with additional social limitations." (R. 292.)

On June 15, 2007, Therapist Tamayo noted that Plaintiff was in compliance with his medications and therapy "now and then." Plaintiff continued to focus on the fact that he could no longer work as an electrician, but his social circle was increasing and he was looking to connect with people. Therapist Tamayo deemed this a "marked improvement" from when he started therapy. (R. 376.) The following month, on July 25, 2007, Therapist Tamayo indicated that Plaintiff needed both individual and group therapy, but that he did not wish to participate in group therapy. (R. 374.) She described his attendance at treatment as fairly consistent, and noted that he was cooperative and "generally follows through on recommendations of the therapist and psychiatrist." (R. 375.)

On October 18, 2007, Joyce Wall, another therapist from CDPH, talked to Plaintiff about the need to reorder his medications. (R. 373, 407.) The next day, Plaintiff told Dr. Mabaquiao that he had run out of medication for two months because he went to Puerto Rico to visit family. Plaintiff complained of depression, mood swings, racing thoughts, insomnia and paranoia. Plaintiff also reported, however, that he felt "alright" when he was taking his medication. (R. 379, 413.) During a therapy session the same day, Therapist Tamayo noted that Plaintiff was not following up with treatment "as had been the case previously." She also reported that he was experiencing more depressive episodes during the winter months. (R. 408.)

5

A couple months later on January 2, 2008, Therapist Tamayo observed that Plaintiff was well-dressed and well-groomed, and reported that he was "wanting to change" his life. Therapist Tamayo told Plaintiff to comply better with his therapy appointments, and recommended that he join Narcotics Anonymous ("NA") and find a sponsor. (R. 382, 405.) Dr. Mabaquiao examined Plaintiff on January 8, 2008, and found him to be neat and appropriate with intact judgment. Dr. Mabaquiao indicated that Plaintiff was still depressed and suffering from delusions, but with medication he experienced "[l]ess voices, less depress[ion] and mood swing and racing thoughts." (R. 384, 412.) Plaintiff was not taking his medication regularly, however, and complained of feeling paranoid, having bad dreams and hearing the voices of dead relatives. Dr. Mabaquiao opined that Plaintiff was doing better overall and sent him for a "lab test" and "physical examination." (*Id*.)

On January 25, 2008, Therapist Tamayo diagnosed Plaintiff with "Bipolar I Disorder Mixed Severe with Psychosis." (R. 395.) Plaintiff was non-compliant with medication at that time, but "motivated for [treatment]." Therapist Tamayo indicated that Plaintiff needed to reduce the frequency of his manic/depressive episodes, and increase compliance with all scheduled treatment and appointments. (*Id*., 398-99.) She assigned him to individual therapy twice per month; group therapy twice per month; case management mental health up to three times per month; client centered consultation up to three times per month; and medication monitoring twice per month. (R. 395-97.)

Therapist Tamayo completed a Discharge/Transfer Summary regarding Plaintiff on April 9, 2008. (R. 400-04.) She confirmed that he suffers from Bipolar Disorder with psychotic features, and assigned him a global assessment of functioning ("GAF") score of 65. Therapist Tamayo indicated that she was closing Plaintiff's case because he "[r]efused [t]reatment," though she thought he would benefit from further treatment. (R. 404.) Eight days later on April 18, 2008, Plaintiff returned to CDPH and asked Therapist Tamayo to reopen his case. (R. 385-86.) Plaintiff had not taken his medication since February, but stated that he "need[ed] someone to speak with."

At that time, he was sad, depressed and "keyed up," and he was experiencing insomnia and auditory hallucinations. (R. 385.) Therapist Tamayo reported that Plaintiff suffered from the following problems: "Bipolar affective disorder, currently depressed, severe, with psychosis." (R. 386.)

Plaintiff saw Therapist Tamayo again on May 7, 2008. Progress notes reflect that he returned to treatment because "his symptoms have increased now that he ran out of medication." Therapist Tamayo advised Plaintiff that "he cannot expect to get better with poor compliance." (R. 388.) She indicated that Plaintiff had only a "fair" ability to adhere to treatment recommendations at that time. (*Id*.) The same day, Therapist Tamayo completed a Comprehensive Adult Assessment of Plaintiff. (R. 389-94.) She described him as having the following laundry list of symptoms: sadness, suicidal thoughts, anxiety, extreme irritability, racing thoughts, talking fast, loss of interest, not wanting to live, changes in appetite, changes in sleep pattern, hopelessness, feeling "empty," tired/slowed down, excessive worry, exaggerated fears, fear of "going crazy," flat affect, avoidance of places/situations, difficulty with concentration, and hallucinations. (R. 390.) For the first time, Plaintiff told Therapist Tamayo about "severe corporal punishment by mother and alcohol abuse by father," and she expressed hope that Plaintiff's non-compliance with treatment "may change this time." (R. 393.) However, she found him "[b]elow average" in his motivation for following up with treatment. (R. 394.)

Therapist Tamayo diagnosed Plaintiff with bipolar disorder, severe depression with psychosis and polysubstance dependence. She indicated that "Lack of Funding, Lack of Social Support, Unemploy[ment], [and] Denial about illness" would all be obstacles to Plaintiff following treatment recommendations. Therapist Tamayo gave Plaintiff a GAF score of 65 at that time. (*Id*.)

7

### B.     Plaintiff's Testimony

Plaintiff testified that he lives with his friend, Mercedes Pepin, in the basement of her house. He has not performed any work since April 1, 2002 because "I don't have any concentration to perform the jobs that I used to do. I would like to work. And when I try to do something I just am unable to do it." (R. 26-27.) He spends the whole day at home watching television, though he sometimes visits his children during the week or sweeps the stairs. (R. 27-28.) Plaintiff said that he has tried to do some repair work around the house, but he never follows through on projects so now Ms. Pepin does not want him to touch anything. (R. 29-30.) He also tried to cook for Ms. Pepin but stopped after he left the stove on. (R. 38.)

In describing his other symptoms, Plaintiff stated that he feels like "they're persecuting me . . . they're coming after me," but he recognized that this was "just in my mind" because there was never anyone behind him. (R. 30, 35.) He reported seeing a therapist once per month and a psychiatrist every two months, but then clarified that he had not received any treatment in the previous three months because his friend stopped paying for the visits and he was trying to get a welfare card. (R. 32-33.) Plaintiff testified that his medications help "a fair amount" and that he has not used illegal drugs for more than two years. (R. 33-35.)

### C.     Vocational Expert Testimony

William M. Newman testified at the hearing as a vocational expert ("VE"). He characterized Plaintiff's previous work as an insulation installer as unskilled and medium, and a prior machine maintenance job as semi-skilled and medium to heavy. (R. 41.) The ALJ indicated his belief that Plaintiff can perform unskilled labor, but asked the VE to consider a hypothetical person with moderate limitations in understanding, remembering and carrying out detailed or complex instructions or tasks, as well as moderate limitations in setting realistic goals or making plans independently of others. (R. 42-43.) The VE testified that these limitations would not affect the

world of unskilled work the person could perform at any exertional level. (R. 43.) Plaintiff's counsel declined to ask the VE any follow-up questions. (*Id*.)

**D.     The ALJ's Decision**

The ALJ found that Plaintiff's depression and history of polysubstance abuse are severe impairments, but that they do not meet or equal one of the impairments listed in the Social Security Regulations. (R. 13-14.) The ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform a full range of work, except that he "is unable to sustain the attention and concentration necessary for detailed or complex tasks and is moderately limited in the ability to set realistic goals or make plans independently of others." (R. 14.) With these limitations, Plaintiff is able to perform past relevant work as a board up person and/or insulation installer. (R. 18.)

In reaching this conclusion, the ALJ discussed in detail Plaintiff's medical history and agreed that his impairments could reasonably be expected to cause the alleged symptoms. (R. 14-16.) The ALJ found Plaintiff not fully credible, however, in his description of the intensity, persistence and limiting effects of those symptoms. In the ALJ's view, Plaintiff's ability to do household chores, care for his personal grooming and use public transportation supported a finding that his daily activities "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (R. 16.) The ALJ also found that Plaintiff's two-month trip to Puerto Rico "tends to suggest that" his complaints "may have been overstated." (*Id*.)

As for Plaintiff's pursuit of treatment, the ALJ concluded that he "has not generally received the type of medical treatment one would expect for a totally disabled individual." (*Id*.) The ALJ noted that Plaintiff was not entirely compliant in taking prescribed medications, even though he felt better when using them. (R. 17.) Plaintiff also failed to attend NA meetings or find a sponsor as recommended by his therapist. The ALJ acknowledged Plaintiff's assertion that he cannot afford

treatment but found it significant that there was no evidence in the record that Plaintiff had pursued any low-income health care options. (R. 16.)

The ALJ concluded that Plaintiff's description of his symptoms and limitations throughout the record "has generally been inconsistent and unpersuasive," and did not support a finding of disability. The ALJ noted that Plaintiff's treating doctors did not recommend any restrictions in his activities, and that Plaintiff had looked for work but was unsuccessful due to his history of substance abuse. In the ALJ's view, the stated RFC was consistent with the findings of the consulting examiners, and not contradicted by any treating source opinions. (R. 17.)

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly

articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

**B.     Five-Step Inquiry**

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act.[2] *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008); *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.     Analysis**

Plaintiff raises several arguments in support of his request for a reversal and remand: (1) the ALJ erred in making the RFC determination, including failing to properly consider all of his mental deficiencies; (2) the ALJ did not make a proper credibility determination; (3) the ALJ failed to analyze the mental demands of his past relevant work; and (4) the ALJ posed an improper hypothetical question to the VE. The court addresses each in turn.

---

[2]   The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

11

1. **RFC Determination**

It is undisputed that the ALJ found Plaintiff to be moderately limited in social functioning and in concentration, persistence or pace. (R. 13.) Plaintiff claims that the ALJ failed to account for these limitations in his RFC, requiring reversal and remand. As a preliminary matter, Plaintiff's arguments regarding concentration, persistence or pace are actually challenges to the hypothetical question the ALJ posed to the VE. The court will consider those arguments in that more appropriate context.

With respect to social functioning, Plaintiff repeatedly told his doctors that he mostly stays by himself and avoids places and situations. (R. 265, 298, 346, 350.) He also testified that he spends most of his time alone and does not interact with anyone besides his children and Ms. Pepin. (R. 29, 38.) Ms. Pepin, in turn, reported that Plaintiff mainly stays in his room alone and does not socialize. (R. 165, 169.) Moreover, Therapist Tamayo indicated that Plaintiff is at high risk of social isolation. (R. 393.)

The ALJ discussed these moderate social limitations, but accepted Dr. Havens's opinion that Plaintiff nonetheless has adequate social skills and the emotional temperament required to interact appropriately with others. (R. 17, 284.) Dr. Havens acknowledged Ms. Pepin's November 2006 assessment that Plaintiff had poor hygiene and rarely bathed; did not handle stress well; and was sensitive with high levels of anxiety. (R. 280.) He also discussed Dr. Buchanan's assessment that Plaintiff showed signs of auditory hallucinations and paranoia. (*Id*.) Dr. Havens questioned Plaintiff's credibility in reporting his symptoms to Dr. Buchanan, but found that regardless, he is able to interact with others and adjust to minor changes in the work environment. (R. 284.) The ALJ addressed in detail this and other evidence in the record regarding Plaintiff's condition, including his testimony and opinions from his treating physician and therapist. (R. 14-17.)

Plaintiff finds an inconsistency between Dr. Havens's "B" Criteria determination that he is moderately limited in social functioning, and the doctor's failure to place any limitations on his social interactions for purposes of the RFC. Courts have found that "[m]oderate limitations under the B criteria are suggestive of a severe impairment, . . . and the ALJ should account for such limitations in setting mental RFC." *Ramos v. Astrue*, __ F. Supp. 2d __, 2009 WL 4555567, at *13 (E.D. Wis. Nov. 27, 2009). Here, however, Dr. Havens expressly opined that Plaintiff's moderate limitations in social functioning do not prevent him from interacting appropriately with others. "Courts have held that when a medical source of record translates his mental health findings into a particular RFC assessment, the ALJ may reasonably rely on that opinion in formulating his RFC." *Basham v. Astrue*, No. 1:08-cv-200, 2009 WL 2462569, at *2 (N.D. Ind. Aug. 10, 2009) (citing *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002)). The ALJ in this case did not err in relying on Dr. Havens's RFC assessment, particularly given that Plaintiff's treating physicians never imposed any greater limitations. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004); *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (ALJ did not err in relying on opinions from state agency consultants where there was "no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ.")

Plaintiff disagrees, objecting that the ALJ failed to explain how a person with auditory hallucinations and paranoia is capable of interacting with the public, co-workers and supervisors. (Pl. Reply, at 2.) Plaintiff first presented with hallucinations while on heroin in 2004, but the symptoms persisted after detoxification. In November 2006, Plaintiff reported having persecutory hallucinations and hearing voices. Dr. Buchanan agreed that in January 2007, Plaintiff's thought processes revealed auditory hallucinations and moderate paranoia. Plaintiff told Dr. Mabaquiao in both January and March 2007 that he heard the voices of his dead relatives and had delusions. In October 2007, Plaintiff complained again to Dr. Mabaquiao of paranoia after he ran out of

medication while visiting family in Puerto Rico. The paranoia, delusions and hallucinations continued into May 2008, by which time Plaintiff had been diagnosed with bipolar disorder.

The ALJ mentioned Plaintiff's hallucinations and delusions, but did not find them limiting for purposes of the RFC. Plaintiff finds this incredulous, but Dr. Havens opined that notwithstanding Plaintiff's hallucinations and paranoia, he still maintains the ability to engage in simple, repetitive and routine tasks, and to interact appropriately with others. (R. 280, 284.) None of Plaintiff's treating physicians suggested otherwise. To the contrary, they repeatedly found him to be well dressed, well groomed and cooperative, with intact judgment and good insight, even when he complained of having auditory hallucinations and believing someone was following him. (R. 379, 382, 384, 387, 390.)

In addition, Plaintiff's GAF scores reflect that his "single worst problem, symptom or functional limitation was no worse than mild." (Def. Resp., at 8.) Specifically, on January 8, 2008, Dr. Mabaquiao assessed Plaintiff with a GAF score of 65, which denotes "some mild symptoms or some difficulty in social, occupational, or school functioning, but 'generally functioning pretty well.'" *Drew v. Astrue*, No. 1:07-cv-243, 2008 WL 4055824, at *2 n.4 (N.D. Ind. Aug. 29, 2008) (quoting American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, at 32-33 (4th ed., Text Rev. 2000)). After going without treatment for several months, on April 18, 2008, Plaintiff scored a GAF of 55, which reflects "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id*. On May 7, 2008, Plaintiff again presented with a GAF score of 65.

GAF scores "are intended to be used to make treatment decisions, . . . not as a measure of the extent of an individual's disability." *Jaskowiak v. Astrue*, No. 08-cv-579-BBC, 2009 WL 2424213, at *12 (W.D. Wis. Aug. 6, 2009). A GAF score may, however, "provide a perspective on a claimant's level of functioning." *Id*. Plaintiff's GAF scores reflect that even when he failed to take

his medication or follow-up with treatment for periods of time, he still only had moderate limitations in social functioning – which is consistent with the ALJ's finding. The social limitations do not appear in the RFC but, as explained, Dr. Havens found Plaintiff capable of interacting appropriately with others in any event, and none of Plaintiff's treating physicians made a contrary finding.

2.     **Plaintiff's Credibility**

The court is troubled, however, by the ALJ's assessment of Plaintiff's credibility regarding the severity of his symptoms. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id*. (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529. The ALJ must provide specific reasons for the credibility finding, but hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent they conflicted with the RFC determination. (R. 16.) In reaching this conclusion, the ALJ did discuss the medical evidence in detail, as well as Plaintiff's own statements regarding his limitations. The ALJ noted, for example, that Plaintiff is unable to concentrate and spends most of the day alone; that he is forgetful and not allowed to cook because he left the stove on; but that he can care for his personal grooming, use public transportation, and travel. (R. 14-16.) The ALJ also stated, however, that Plaintiff's lack of

compliance in taking prescribed medications or attending therapy "suggests that the symptoms may not have been as limiting as the claimant has alleged." (R. 17.) He further commented that despite Plaintiff's testimony that he can no longer afford treatment, "one might expect" him to pursue low-income health care options "if [he] truly were unable to work due to the symptoms alleged in this case." (*Id.*) In the ALJ's view, Plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual." (R. 16.)

The problem with these assertions is that the Seventh Circuit has recognized that "mental illness in general and bipolar disorder in particular . . . may prevent the sufferer from taking [his] prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006). In addition, though failure to seek medical treatment may be inconsistent with a claim of debilitating impairments, *Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005), an ALJ "'must not draw any inferences' about a claimant's condition from this failure [to seek treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (quoting SSR 96-7p)).

Here, the ALJ did not consider the possibility that Plaintiff, who has been diagnosed with bipolar disorder, failed to take his medications and pursue treatment due to his mental illness. *See Wadsworth v. Astrue*, No. 1:07-cv-0832-DFH-TAB, 2008 WL 2857326, at *8 (S.D. Ind. July 21, 2008) (credibility finding reversed where the ALJ concluded that "the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual.") Nor did the ALJ ask Plaintiff about his application for a welfare card or other efforts to seek low-income health care options once Ms. Pepin stopped paying for his doctor visits. *See* SSR 96-7p (an explanation for not seeking medical care may include that the claimant does not have "access to free or low-cost medical services.")

Also troubling is the ALJ's statement that if Plaintiff truly was disabled, "one might expect to see some indication in the treatment records of restrictions placed on the claimant by his treating

doctor." (R. 17.) The ALJ does not indicate what "restrictions" might evidence disability, and this phraseology tends to suggest that the ALJ may have improperly "played doctor." *See Boyd v. Astrue*, No. 09 C 1217, 2009 WL 5149136, at *10 (N.D. Ill. Dec. 28, 2009) (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)) (ALJs must not "succumb to the temptation to play doctor by making their own independent findings, because 'lay intuitions about medical phenomena are often wrong.'") On the facts presented, the court cannot say that the ALJ's credibility determination is supported by substantial evidence, requiring a remand for further consideration of the issue.

### 3. Plaintiff's Past Relevant Work

Plaintiff next contends that the ALJ erred in failing to assess the mental demands of his past jobs before finding him capable of performing them. (Pl. Mem., at 9-10.) Plaintiff directs the court to *Nolen v. Sullivan*, 939 F.2d 516 (7th Cir. 1991), in which the ALJ found the plaintiff able to perform his past work mixing paint without specifying the duties involved in that job. *Id*. at 519. The court remanded the case for further consideration of the issue in light of the plaintiff's existing physical capacities. *Id*. *See also Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984) ("To determine whether [a claimant] is physically capable of returning to her former work, the administrative law judge obviously must ascertain the demands of that work in relation to the claimant's present physical capacities.")

As in *Nolen*, the ALJ failed to ask the VE whether someone with Plaintiff's mental limitations could perform his past work as a board up person or an insulation installer. Nor was there any discussion of the mental demands of those jobs. Instead, the ALJ had the VE confirm that both jobs are unskilled work, and that Plaintiff's limitations would not prevent him from performing "unskilled labor at any exertional level." (R. 41-42.) With that, the ALJ concluded:

> His mental impairment would only prevent his being able to perform anything more than unskilled work activity. Therefore, the claimant is able to perform all of his past unskilled work.

(R. 18.) This is inadequate. *See Singleton v. Astrue*, No. 3:06-cv-0760-CAN, 2008 WL 425528, at *8 (N.D. Ind. Feb. 13, 2008) ("An ALJ cannot describe a claimant's job in a generic way, such as 'unskilled at the light exertional level,' and conclude, on the basis of the claimant's residual capacity, that she can return to her previous work."); *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *18-19 (N.D. Ill. Sept. 16, 2009) (reversing ALJ's decision where he failed to compare the specific physical and mental demands of the claimant's past work and his existing capabilities).

The Commissioner concedes that the ALJ "could have possibly phrased his questions better," but insists that any error in that regard was harmless. (Def. Resp., at 12.) *See Bacidore v. Barnhart*, No. 01 C 4874, 2002 WL 1906667, at *10 (N.D. Ill. Aug. 19, 2002). In the Commissioner's view, the VE "presumably understood that the ALJ was trying to determine if Plaintiff could perform his past work and would have identified Plaintiff's past work as exceptions to the unskilled jobs that could be performed, if there were any." (Def. Resp., at 12.) Perhaps, but the court cannot affirm a decision based on such speculation. *See White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence.") Notably, the ALJ barely pursued this line of questioning with the VE, stating that he "really didn't intend to ask any hypotheticals" at all. (R. 42.) The court cannot be certain that the ALJ properly considered Plaintiff's ability to perform his past work in light of his mental limitations.

4. **The Hypothetical Question**

Plaintiff finally objects that the ALJ's hypothetical question to the VE failed to account for his moderate limitations in concentration, persistence or pace. The ALJ asked the VE to consider a person with moderate limitations in understanding, remembering and carrying out detailed or

complex instructions or tasks. Plaintiff agrees that "the inability to perform detailed and complex tasks limits a claimant to performing simple tasks," (Pl. Reply, at 4 n.2), but notes that ALJs cannot account for limitations of concentration, persistence and pace by restricting a claimant to simple, routine tasks. *Stewart v. Astrue*, 561 F. 3d 679, 684-85 (7th Cir. 2009). Plaintiff is correct, except for the following exception: an ALJ may use "words describing work, such as unskilled, simple, repetitive, routine" in hypothetical questions to the VE "if a doctor used the descriptive language to describe what work a claimant can perform in spite of his limitations." *Coots v. Astrue*, No. 08 C 2197, 2009 WL 3097433, at *8 (C.D. Ill. Sept. 22, 2009). *See also Johansen*, 314 F.3d at 289 (ALJ's hypothetical limiting the claimant to repetitive, low-stress work was proper where a medical expert translated the ALJ's finding of moderate limitations in the ability to maintain a regular schedule and attendance and to complete a normal workday and workweek without interruptions from psychologically-based symptoms into a specific RFC assessment that the claimant could still perform low-stress, repetitive work).

In this case, Dr. Havens, who performed the only mental RFC in the record, found that Plaintiff is moderately limited in the ability to understand, remember and carry out detailed instructions, which is exactly what the ALJ posed to the VE. Dr. Havens went on to explain that Plaintiff "can understand and remember well enough to engage in simple assignments," and "can concentrate and persist adequately on repetitive, routine tasks." (R. 284.) With this medical translation, the court finds no error in the hypothetical question, even though the ALJ did not expressly ask about limitations in concentration, persistence and pace.

Plaintiff's reliance on *Kasarsky v. Barnhart*, 335 F.3d 539 (7th Cir. 2003), to support his theory is misplaced. The physician in that case completed only a Psychiatric Review Technique Form and not an RFC, whereas Dr. Havens completed both. 335 F.3d at 544. In addition, the ALJ in *Kasarsky* inconsistently found that the claimant had frequent deficiencies of concentration, persistence or pace, but asked the VE about a hypothetical individual who was "not precluded from

understanding, remembering, and carrying out detailed instructions." *Id*. No such inconsistency exists here.

Plaintiff's other cited cases are equally inapposite. In *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008), the ALJ failed to mention the opinion of the only doctor who filled out a mental RFC assessment. The ALJ's finding that the claimant could perform "unskilled" work was "unhelpful" absent some reference to the doctor's translation of that term into specific abilities. *Id*. at 677. In *Stewart*, there was no evidence that a physician had translated the claimant's limitations in concentration, persistence and pace into a restriction to performing simple, routine tasks; rather, the ALJ did that on his own. 561 F.3d at 684-85. Plaintiff's motion for remand based on the hypothetical question posed to the ALJ is denied.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 19] is granted in part and denied in part. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: March 29, 2010

*Nan R. Nolan*
_____
NAN R. NOLAN
United States Magistrate Judge